LOUGHERY (UNITED STATES v.). See Case No. 15,631.

---

## Case No. 8,527.

### In re LOUIS et al.

[3 Ben. 153; [1] 2 N. B. R. 449 (Quarto. 145); 2 Am. Law T. Rep. Bankr. 75; 16 Pittsb. Leg. J. (O. S.) 45.]

District Court, S. D. New York. Feb. 29, 1869.

PREFERENCE BY BANKRUPT WHILE INSOLVENT—DISCHARGE.

1. Where a firm was carrying on business in different places in Ohio and Tennessee, and their paper went to protest about April 1st, 1867, and about the same time some of their establishments were seized by the government of the United States for alleged violations of the internal revenue law [13 Stat. 223]. and within a short time there r they transferred to seven different credit. four stocks of goods and their real estate. towards payment of the debts due by them to such creditors: *Held*, that, on the facts, the bankrupts were insolvent when such transfers were made.

[Cited in Graham v. Stark, Case No. 5,676.]

2. Such transfers of goods were giving fraudulent preferences. contrary to the provisions of the 39th section of the bankruptcy act [of 1867 (14 Stat. 536)], and discharges must be refused to the bankrupts.

[Cited in Re Doyle. Case No. 4,051; Re Warner, Id. 17,177; Re Hannahs, Id. 6,032.]

[In the matter of Adolph Louis and Henry Rosenham, bankrupts.]

G. & M. Sackett, for bankrupts.

H. H. Rice, for opposing creditors.

BLATCHFORD, District Judge. The first nine specifications filed in opposition to the

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

discharge of the bankrupts are, that the bankrupts, early in April, 1867, at Cincinnati, Ohio, while insolvent, transferred to various creditors of theirs, seven in number, real estate of theirs in Kentucky, Iowa and Texas, two stocks of goods in Memphis, Tennessee, a stock of goods at Nashville, Tennessee, and a stock of goods at Bolivar, Tennessee, for the purpose of preferring such creditors and of preventing such property from coming to the hands of an assignee in bankruptcy; that the transfers of the stocks of goods were made in a lump to each creditor, without any inventories being made; and that such transfers were fraudulent and void under the bankruptcy act.

The paper of the bankrupts first went to protest about the 1st of April, 1867. They were then in fact insolvent; but, professing to believe that they were not, they commenced immediately, and continued during April and May, 1867, to turn out their property in payment of debts due to certain of their creditors, to the exclusion of others. Their indebtedness on the 1st of April, 1867, was about $500.000. By the 1st of June, 1867, according to the evidence, they had in that way paid off from $300,000 to $400,000 of such indebtedness. When their paper so went to protest, they were engaged in business as general merchants, as copartners, under the name of A. Louis & Co., dealing in wines, liquors, dry goods, and boots and shoes, with their headquarters at Cincinnati, Ohio, and branches at Memphis, Tennessee, Nashville, Tennessee, and Bolivar, Tennessee. Their assets consisted of merchandise, real estate, bank stocks, insurance stocks, book accounts and bills receivable. They had two stocks of goods at Memphis, one at Nashville and one at Bolivar. Their business at Cincinnati was manufacturing and rectifying spirits and dealing in wines and liquors. Their stock of whiskey at Cincinnati was seized by the United States about the 1st of April, 1867, with their manufacturing and rectifying establishment there, for alleged infractions of the internal revenue laws. The property remained under seizure till the latter part of May, 1867. The effect of the going to protest of their paper, and of the simultaneous seizure of their property at Cincinnati, seems to have been to break up their business everywhere, for, within a week or so thereafter, they turned out to creditors the four stocks of goods referred to, and their real estate in Kentucky, Iowa and Texas. One of the stocks of goods at Memphis was transferred towards payment of a debt of $100,000, and the other towards payment of a debt of $60,000. The stock of goods at Nashville was turned out towards payment of a debt of about $25,000, and the stock of goods at Bolivar towards payment of a debt of about $28,000. The property seized by the government was turned over, about the 23d of May, 1867, on a compromise made with the government, to a person who paid to the

government on behalf of the bankrupts, $15,-000, and became endorser on two notes of theirs, each for $5,000, given to the United States, payable in one and two years, respectively. It is not quite clear whether other property of the bankrupts was turned out as security to the same person. When they suspended payment, they made out no balance sheet. They carried on no business at Cincinnati after their suspension, but they paid many of their creditors with the proceeds of collections made from parties who owed them, and out of the other assets beforementioned. Their petition in bankruptcy was filed February 29th, 1868. It sets forth debts due by the firm composed of the bankrupts, amounting to nearly $90,000, and eighteen debts due to sixteen creditors in Cincinnati and two in New York City, the amounts of all of which eighteen are put down as unknown. Among these eighteen are the creditors to whom the four stocks of goods and the real estate before-mentioned were transferred. All of the debts due to the eighteen creditors are either for notes of A. Louis & Co., endorsed and paid by such creditors, or for money loaned to A. Louis & Co. by such creditors. There are no copartnership assets set out in the petition, except about $85,000 of debts due to the firm on open account, from creditors, nearly three hundred in number, scattered all over the United States, and a lease of real estate in Cincinnati, valued at $30,000 and mortgaged for $29,500. The individual debts of the bankrupt Louis are put down at a little over $2,000, and his individual assets at $1,000 worth of household furniture, mortgaged for $800. The individual debts of the bankrupt Rosenham are put down at $3,400, and one debt, amount unknown, due to a firm in New York, and his individual assets at $150 worth of wearing apparel.

On the foregoing facts, I must hold, not only that the bankrupts were insolvent on and after the 1st of April, 1867, but that they had good grounds for believing themselves insolvent, and that they acted on such belief in making the preferences they did among their creditors. After the 1st of April, 1867, they were not able to pay all their debts in the usual and ordinary course of business, as persons carrying on trade usually do, and their business was broken up. All this they knew. This constituted insolvency, within the meaning of the bankruptcy act, and they, therefore, not only had reasonable grounds for believing themselves insolvent, but, in judgment of law, they knew they were insolvent. With this knowledge, they, as one of them testifies, struggled along and paid along until the latter part of May. In doing so, they made the preferences referred to, intending to pay the favored creditors, whether the others should receive anything or not. This was a giving of fraudulent preferences under section 29, contrary to the provisions of the act, being directly contrary to the

provisions of section 39 of the act. This whole subject is thoroughly discussed and disposed of by Judge Fox, of the district court for the district of Maine, in a very full and able opinion,—In re Gay [Case No. 5,279], —in which I concur. The bankruptcy act was in operation, so as to make these transactions of the bankrupts a fraud on the act, from and after the 2d of March, 1867. Perry v. Langley [Case No. 11,006]. The first nine specifications are, therefore, sustained, and discharges are refused.